Rev. Chester O. THOMPSON, Individually and on behalf of all others similarly situated, et al., Appellants,

v.

Walter WASHINGTON, Individually and as Commissioner of the District of Columbia and as "The Authority" of the National Capital Housing Authority Under Executive Order.

No. 71–2049.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1972.

Decided Dec. 10, 1973.

As Amended Dec. 20, 1973.

Edward E. Schwab, Washington, D. C., for appellants.

Dirk D. Snel, Atty., Dept. of Justice, of the Bar of the United States Supreme Court, pro hac vice, by special leave of the Court, with whom Kent Frizzell, Asst. Atty. Gen., and Edmund B. Clark, Atty., Dept. of Justice, were on the brief for appellee.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case is one of three related cases decided today which involve the procedural rights of tenants of housing, constructed under various provisions of the Federal housing legislation, prior to official approval of rent increases. In the case at bar, we hold that tenants of low-rent public housing are entitled not only to receive notice of proposed rent increases but also to participate in the process of official consideration of rent increases by making written presentations. In Marshall v. Romney, No. 71–1786, we hold that the same opportunities must be afforded tenants of low- and moderate-income housing constructed pursuant to § 221(d)(3) of the National Housing Act, with both FHA mortgage insurance and below-market-interest-rate loans. In Tenants' Council of Tiber Island v. Lynn, No. 71–1931, we hold that the opportunity to participate need not be accorded tenants of housing constructed under § 220 of the Housing Act, as part of area redevelopment plans.

The case at bar is a class action for injunctive and declaratory relief, brought in 1969 by Chester H. Thompson on behalf of tenants of approximately 6000 rental units of the National Capital Housing Authority (NCHA). Plaintiff complained of failure to accord the tenants the procedural requisites for approval of the rental increases in low-rent public housing programs established under the United States Housing

Act (Act) as amended, 42 U.S.C. 1401 et seq. The suit named as defendants "Mayor" Washington, Commissioner of the District of Columbia, and his Assistant, in their capacity as the members of the NCHA (see E.O. 11401, 33 F.R. 4559), certain NCHA subordinates, and the Secretary of the Department of Housing and Urban Development (HUD) and two subordinates. Plaintiffs sought to enjoin a major modification of the rent schedule approved by those officials, scheduled to become effective January, 1970. The plaintiff class consists of the majority of NCHA tenants, who pay according to a "graded rent" schedule, and does not include certain welfare recipients, elderly tenants, and others, paying so-called flat rents, who were not affected by this rental increase.

This is the second time this litigation has come before this court. In McKinney v. Washington, 143 U.S.App.D.C. 4, 442 F.2d 726, decided November 25, 1970, the court affirmed the denial of a preliminary injunction on the ground that appellants were unlikely to prevail on the merits. The case now comes before the court on appeal from the District Court's order of October 15, 1971, granting the defendants' motion to dismiss the amended complaint. The plaintiff class raises two distinct claims: (1) The summary procedures used by NCHA and HUD—wholly excluding notice to the tenants of the proposed rent increases (by NCHA), or opportunity for tenants to express views, or to present evidence in opposition, on review of rent increase proposals (by HUD)—violate the Act and administrative due process. (2) A rent increase which is beyond "the financial reach of families of low income" violates the Act. The District Court dismissed the complaint on the grounds that it was a suit against the United States to which it had not consented, and failed to state a claim on which relief could be granted. We reverse the dismissal of the complaint and remand for further proceedings.

## I. STATEMENT OF FACTS AND STATUTORY BACKGROUND

The program of low-rent public housing was established by the United States Housing Act of 1937.[1] The legislation authorized a variety of Federal subsidies to Local Housing Authorities, such as the National Capital Housing Authority, to assist in the development and operation of the housing projects. When constructing new units of public housing, the LHAs float tax-free bonds, guaranteed by the Federal Government.[2] The Federal Government also has the authority to make grants to LHAs in the form of annual contributions,[3] including subsidies for certain categories of tenant families,[4] for modernization and rehabilitation of projects,[5] and for tenant services.[6] In addition to grants, loans may be made for specified purposes.[7] The local government also subsidizes the LHA by agreeing to accept Payment in Lieu of Taxes, through which the LHA gets an effective reduction in real estate and other local taxes.[8]

The history of NCHA's economic affairs in the 1960's illustrates the current financial crisis generally affecting public housing.[9] Federal subsidies to LHAs in this period derived from an Annual Contributions Contract, which provided generally that the projects would be self-supporting, with operating expenses paid from income. During most of the 1960's whatever operating deficits arose could be covered by "residual receipts" —past surpluses accumulated during prior successful years of operation.[10] In 1968, however, HUD had to commit $7,000,000 to NCHA for the purpose of modernizing its projects.[11]

In the years immediately preceding the requested rental increase of 1969, the NCHA was running operating deficits in its current budget and was required to spend $2.4 million in reserve funds to supplement income derived from rents.[12] In October 1969, however, NCHA claimed exhaustion of its reserves. At the end of fiscal year 1969 (June 30) NCHA had an operating deficit of $910,000 and anticipated the deficit would grow. NCHA applied for a $900,000 loan from HUD, promising to repay the loan from future grants under § 10(a) of the Act, providing for special subsidies for large families and elderly tenants.[13]

1. 42 U.S.C. § 1401 et seq., as amended (Supp.1973).

2. *See* National Institute for Education in Law and Poverty, Handbook on Housing Law, ch. IV, Pt. II, at 5–9 (1971).

3. 42 U.S.C. § 1410(a) (1970).

4. 42 U.S.C. § 1415(12). In addition to payments made under the annual contributions contract, special subsidies are authorized for the elderly, handicapped families, or families displaced by urban renewal or a low-rent housing project.

5. 42 U.S.C. § 1411 (1970) provides for "Capital grants in assistance of low rentals." *See,* Low-rent Housing, The Modernization Program Handbook, RHA 7485.1 (June 1969).

6. 42 U.S.C. § 1415(10) (1970). These services consist of counseling on such problems as money management and job referrals.

7. 42 U.S.C. § 1409 (1970).

8. See 42 U.S.C. § 1413(c) (1970).

9. *See* R. Pozen, The Financing of Local Housing Authorities: A Contract Approach for Public Corporations, 82 Yale L.J. 1208 (1973). The District of Columbia has been allowed to participate in the low-rent housing program from its inception as if the District were a state, 42 U.S.C. § 1402(12). Therefore, the Alley Dwelling Act, 5 D.C. Code §§ 103–116 (1973), empowers the National Capital Housing Authority to accept funding and operate low-rent housing projects.

10. *See* R. Pozen, note 9 *supra* at 1208.

11. Affidavit of Lawrence M. Cox, Assistant Secretary for Renewal and Housing Assistance, HUD, filed Oct. 30, 1969, with Dkt. Entry 17.

12. Affidavit of Edward Aronov, Secretary and Executive Director of the National Capital Housing Authority, filed Oct. 30, 1969, with Dkt. Entry 17) ; Letter to tenants of NCHA, from Monteria Ivery, Sr., Acting Executive Director, filed October 30, 1969, with Dkt. Entry 17).

13. Cox Affidavit, *supra* note 11.

NCHA then applied to HUD for a $3-million administrative loan which HUD was authorized to grant under § 9 of the 1937 Act, as amended, 42 U.S.C. § 1409. The loan was intended to meet anticipated operating deficits in fiscal years 1970 and 1971. While this application for a loan was pending, HUD was reviewing the FY 1970 proposed budget submitted by NCHA in April 1969. Meanwhile NCHA, in order to reduce its projected deficit, had secured the agreement of District of Columbia officials to reduce further or eliminate payments in lieu of taxes.[14] On June 27, 1969, HUD rejected the budget submitted because the expenditures projected exceeded the income anticipated.[15] The crisis came to a head on July 22, 1969, when HUD notified NCHA by letter that approval of its budget, and considerations of its $3,000,000 loan application, was dependent on NCHA's devising "a rent schedule that will produce sufficient income to assure the Authority's attaining financial stability within the next few years."[16] NCHA responded by proposing a new graded rent schedule, approved by HUD on September 19, 1969, and announced by NCHA to tenants by a letter dated October 1, 1969. That rent schedule is the subject of this litigation.[17]

To understand the nature of the rent increases some explanation of the graded rent structure is needed.[18] The schedule sets rent primarily on the basis of family income and family size. Family size is taken into account indirectly by providing different rents for different sized dwelling units. Gradation with respect to family income can be illustrated by the structure of rents for a one bedroom apartment under the new rent schedule. The minimum rent for that apartment is $40 per month, while the maximum is $110 per month. The minimum rental calculates to 26% of an annual income of $1800, and a tenant family with that income is entitled to the minimum rental, but it calculates to 48% of the income of a family with, say, $1000 annual income.[19]

Submissions by the parties furnish contradictory information as to the precise impact of the new rent schedule on tenants. For example, appellants assert that the average amount of increase is $23.17 per month for the 6,000 units affected (Reply Br. 3), while the Government brief (p. 6) claims the increase is $11.16 per unit month. We cannot resolve such matters on the record before us, particularly since neither the Government nor the District Court developed its legal position on the basis of such factual refinements. On a motion to dismiss we must accept the averments of the complaint, that NCHA's proposed rent increases (between $10 and $44 per month) amount to between 17 and 38% of the previous rent (par. 7), and that the new rents are beyond the financial means of plaintiffs. Appellants assert (Br. 13) that the increased rents force many members of plaintiff class to forego basic necessities of life.[20]

14. Letter of June 26, 1969, from Thomas W. Fletcher, Deputy Mayor-Commissioner, District of Columbia to Edward Aronov, filed October 30, 1969, with Dkt. Entry 17.

15. Letter of June 27, 1969 from Robert Lifshin, Acting Director, Tenant and Operations Services Division, HUD, to Edward Aronov, filed October 30, 1969.

16. Letter from Vincent A. Marino, Assistant Regional Administrator for Housing Assistance, HUD, to Edward Aronov, filed October 30, 1969, with Dkt. Entry 17.

17. The new rent schedule was embodied in NCHA Order No. 69–18 which replaced Order No. 69–10, issued on May 16, 1969.

18. The revised rent schedule is at JA 30–32. This represented the only change in the graded rent structure since 1962. A copy of the 1962 graded rent schedule is in the record, as filed December 2, 1969, with Dkt. Entry 34.

19. This calculation reflects no special assistance from HUD to reduce the impact of the rent increase. The record is silent regarding special assistance.

20. It should be noted, without importing any conclusion or ruling by this court on the matter, that the complaint relies on 42 U.S. C. § 1402(1), which provides that rent shall be fixed and approved only after considering

Plainly, the NCHA faced a difficult situation in 1969, a situation shared by most LHAs at that time. In view of operating deficits under the existing rent schedule the only alternative to increased Federal subsidies was an increase in rents (unless economies which would reduce project expenses could be discovered).

■ In December, 1969, Congress enacted an amendment to the 1937 Housing Act, known as the Brooke Amendment,[21] setting a rent ceiling at 25% of family income. It authorized HUD to pay additional annual contributions to "make up the amount by which the proportionate share of operating and maintenance expenses attributable to a public housing unit exceeds 25 percent of the tenant's income." [22] Although the Government asserts in its brief that the NCHA is now complying with this ceiling limitation,[23] and that the applicability of the Brooke Amendment is not posed in this litigation, we may note that Congress has not appropriated enough money to cover operating deficits. Thus LHAs, faced with operating deficits but unable to raise rents, may see the specter of bankruptcy.[24] It may

be that LHAs could stave off disaster by increasing average income levels, and perhaps maximum income levels, of the families admitted to public housing, but such a course has unwelcome consequences. We advert to these factors not as points for decision by this court, but as matters supplying context and perspective for the issues tendered to us by this case. Finding no merit in the Government's claim of sovereign immunity,[25] we proceed to examine the specific claims raised in this litigation.

## II. JURISDICTION AND STANDING

Jurisdiction of this action lies under 28 U.S.C. § 1361,[26] in view of the claim that NCHA or HUD has a duty under law to afford plaintiffs a hearing before passing on proposed rent increases. *See* Langevin v. Chenango Court, Inc., 447 F.2d 296, 300 (2d Cir. 1971) and Hahn v. Gottlieb, 430 F.2d 1243, 1245 n. 1 (1st Cir. 1970), holding jurisdiction based on section 1361 proper in suits by § 221(d)(3) tenants seeking a hearing before FHA prior to rent increase. *See also* Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 294–295, 427 F.2d 561, 564–565 (1970).

---

factors affecting ability of each individual tenant family to pay, and quotes NCHA Regulations ¶ 4531.21, 23, as providing that rents are set at amounts "the low-income part of the population . . . can afford to pay" so that "no family pays more than a fair share of its income for rent." The amended complaint alleges, par. 13, that the rent schedules do not maintain a rent-income ratio of 1 to 5 as between maximum rent for a particular unit and net family income of a family eligible to occupy it. The Government brief asserts (p. 5) that the new rent schedule takes up between 20% and 30% of family income, but that assertion is based upon an assumed correspondence between the income levels of families and the size of the units they occupy. The plaintiff's memorandum filed in the District Court on October 31, 1969, asserts that NCHA's own figures, in its 1967 Annual Re-Examination, show 341 families with incomes below $1,000, some in units of 2 bedrooms for which the minimum monthly rent was then $33 and is now $44—figures that amount to 40% and 52%, respectively, of a $1,000 annual income.

21. Pub.L. 91–152, 83 Stat. 379 (1969), sec. 213.

22. H.Rep.No.91–740, 91st Cong., 2d Sess. 31 (1969).

23. Brief of Appellees at 6.

24. See R. Pozen, note 9 *supra*, at 1208–09.

25. We think the defense of sovereign immunity raised by the Government is precluded by our disposition in Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045 (1971) which held there was no sovereign immunity from a claim against NCHA alleging failure to observe statutory, contractual, and regulatory obligations.

26. 28 U.S.C. § 1361 (1970) provides as follows:
 The district court shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

**632**

Since the suit is brought against an officer of the Federal Government, it is distinguishable from an action against a private landlord, claiming denial of due process in the eviction process, where jurisdiction may require an additional element of state action. Compare Mc-Queen v. Druker, 438 F.2d 781 (1st Cir. 1971) and Colon v. Tompkins Square Neighbors, 294 F.Supp. 134 (S.D.N.Y. 1968) with McGuane v. Chenango Court, Inc., 431 F.2d 1189 (2d Cir. 1970).[27]

■ We also find standing, under the standards established in Ass'n of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The approval and imposition of the rent increase supplies the adversariness and ripeness required for constitutional standing. There is injury in fact. The claim asserted is "arguably" within the zone of interest protected by the Housing Act, Hahn v. Gottlieb, *supra*, in view of the provision establishing the goal of "a decent home" for every citizen, 42 U.S.C. § 1441 (1970), and of §§ 1 and 2 of the Housing Act of 1937, 42 U.S.C. § 1401–02, which indicate that the purpose of public housing is to make housing available to "families of low income."

## III. TENANTS' RIGHT TO HEARING BY WRITTEN PRESENTATIONS

### A. *The Statutory Interest Underlying Plaintiffs' Hearing Claim*

The plaintiffs claim that they are entitled to an opportunity to be heard before their rents for public housing are increased. They assert that the right to be heard arises from the Housing Act and from the mandate of the Due Process clause.

We begin by assessing the definition and scope of plaintiffs' interest under the statute. Examination of the statute is necessary even to resolve plaintiffs' claim that a hearing is constitutionally required, for the mandate of the Due Process Clause is triggered by the deprivation of some "interest" created by law. In Goldberg v. Kelly, the Court noted that welfare benefits are a matter of *"statutory entitlement* for persons qualified to receive them." 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (emphasis added). Although the right-privilege distinction may have limited utility, there must be an interest to which due process protection will attach.[28] Here the source of that interest, if any, is the Housing Act.

The "Declaration of Policy" contained in Section 1 of the 1937 Housing Act, 42 U.S.C. § 1401 (1970), provides:

> It is declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit . . . to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban, rural nonfarm, and Indian areas, that are injurious to the health, safety, and morals of the citizens of the Nation.

Section 1401 further provides that, in the first instance, responsibility is to vest in local public housing agencies for "administration of the low-rent housing program, including responsibility for the establishment of rents and eligibility requirements (subject to the approval of the [Federal Housing] Authority), with due consideration to accomplishing the objectives of this chapter while effecting economies."

27. The suits against private landlords in which the sufficiency of state involvement has been questioned have been brought under the Civil Rights Act, 28 U.S.C. § 1343(3).

28. See Burr v. New Rochelle Municipal Housing Authority, 479 F.2d 1165 (2d Cir.

1973); King v. New Rochelle Municipal Housing Authority, 442 F.2d 646 (2d Cir.) cert. denied, 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971) (low-income persons perceived as beneficiaries of public housing).

Section 1402 then provides that:

(1) The term "low-rent housing" means decent, safe, and sanitary dwellings within the financial reach of families of low income, and developed and administered to promote serviceability, efficiency, economy, and stability, and embraces all necessary appurtenances thereto. The dwellings in low-rent housing shall be available solely for families of low income. . . . [I]ncome limits for occupancy and rents shall be fixed by the public housing agency and approved by the Authority after taking into consideration (A) the family size, composition, age, physical handicaps, and other factors which might affect the rent-paying ability of the family, and (B) the economic factors which affect the financial stability and solvency of the project. . . . (2) The term "families of low income" means families (including elderly and displaced families) who are in the lowest income group and who cannot afford to pay enough to cause private enterprise in their locality or metropolitan area to build an adequate supply of decent, safe, and sanitary dwellings for their use. . . .

■■ These provisions make it clear that rent limitation is the prime feature of these programs, and that the purpose of public housing is to make housing available to the "families of low income." The very premise of the program is that the rents will be substantially lower than those obtainable in the private market; otherwise public housing would not be necessary. While the NCHA and HUD have discretion under §§ 1401 and 1402 to determine the levels and structure of rents in public housing, these agencies must be guided by the general directive that the rents be "within the financial reach of families of low income."

### B. Tenants' Claim of Right to Hearing

■ In providing for controlled rents, Congress plainly intended to create a benefit in favor of tenants to enjoy subsidized housing at less than market price. The Housing Act is silent on the question whether Congress intended to provide the tenant beneficiaries with procedural rights to assert further their interests during the process of rent-fixing by LHAs. We uphold the tenants' claim of a right to be heard, as set forth in Section E of this opinion, finding such rights in the statute, albeit by implication rather than express provision. While a disposition on statutory grounds sometimes allows a court to bypass constitutional questions, the statutory interpretation advanced in the present case is based in material degree on the strength of the plaintiffs' constitutional contentions, leading us to perform "our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality." Richmond Co. v. United States, 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928). Our ruling avoids a decision on the constitutional claims, in furtherance of the settled practice of the Federal courts to construe Federal statutes to avoid troublesome constitutional issues.[29] But we approach the statutory question in the light of our consideration of the constitutional issues, to which we now turn.

### C. The Due Process Issues

Justice Brennan's opinion in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), holding that welfare benefits could not be terminated without a hearing, and Justice Harlan's opinion in Boddie v. Connecticut, 401

---

29. *See, e. g.,* United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851 (1929); United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916); *United States v. Delaware & Hudson Co.,* 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909).

U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), holding the requirement of a filing fee for indigents applying for divorce a violation of due process, have brought new focus to the due process right to be heard. More recently, with the decision in Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), which held summary replevin violative of due process, commercial practices once thought unassailable have come under attack.[30]

The right-privilege distinction, once the touchstone for confining the protection of due process, has given way to a more flexible approach.[31]

■ Under the current Supreme Court doctrine, the existence and extent of due process procedural requirements turn upon consideration of three factors, which may, but need not, be interrelated: (1) the nature of the forum through which the Government acts; (2) the source of the "interest" of the citizen upon which Government action impinges; (3) the extent, in fact, of the deprivation which the Government action occasions.

### 1. *Nature of forum.*

The core of due process as a right to be heard was originally rooted in the judicial forum, where it has been vigilantly supervised to assure that the opportunity given is a reality and not a gesture.[32] Due process safeguards the civilizing function of the law, and is rec-

ognition that "[t]he right to sue and defend in the courts is the alternative of force." Chambers v. Baltimore & O. R. Co., 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907). The importance of courts in the resolution of disputes in a civilized society is the bone structure of the opinion in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), where the Court held the requirement of filing fees in divorce cases to violate due process when it barred would-be litigants from "the only forum effectively empowered to settle their disputes." 401 U.S. at 377, 91 S.Ct. at 785.

While many procedural due process cases involve the judicial process, the principles are fully applicable to any executive or administrative forum entrusted with determinations of significant rights. That was held as long ago as Londoner v. City of Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), where the duty of making street improvement assessments and apportioning of taxes was vested in a board of equalization. The Court held that notice and hearing by the board were required before the tax was irrevocably fixed, although "[m]any requirements essential in strictly judicial proceedings may be dispensed with . . . ." 210 U.S. at 386, 28 S.Ct. at 714. Application of due process protection to executive and administrative action has followed from recognition of the basic principle that "the constitutional right to be heard is a basic aspect of the duty of government

---

30. *Compare* Adams v. Egley, 338 F.Supp. 614 (S.D.Cal., 1972) (California Commercial Code Section 9–503, 9–504 invalidated) *with* Lebowitz v. Forbes Leasing and Financing Corporation, 456 F.2d 979 (1972), cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972).

31. *See* Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1972); Board of Regents v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

32. In invalidating a procedure for notice only by publication to absent beneficiaries of a common trust fund, Justice Jackson said for the court in Mullane v. Central Hanover Tr. Co.:

> "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.
>
> \* \* \* \* \*
>
> But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." 339 U.S. 306, 313–315, 70 S.Ct. 652, 656–657, 94 L.Ed. 865 (1950).

to follow a fair process of decisionmaking." Fuentes v. Shevin, *supra*, 407 U. S. at 80, 92 S.Ct. at 1994.[33] This due process principle has vitality for executive and administrative determinations. *See, e. g.*, Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Goldberg v. Kelly, *supra*.

### 2. *Source of interest.*

The scope of due process protection also takes into account the source of the interest for which the citizen asserts the protection. It has long been clear that the protected interests include those interests in personal liberty and property nurtured at common law. *See* Windsor v. McVeigh, 93 U.S. 274, 23 L.Ed. 914 (1876). Protection of property interests has never been in doubt, but the extent of the protection has recently been extended. *See* Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (wage garnishment); Fuentes v. Shevin, *supra* (summary repossession). And Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S. Ct. 507, 27 L.Ed.2d 515 (1971) establishes that a person's interest in his own reputation merits procedural due process protection.

Sound analysis and authoritative precedent conjoin to make it clear that the zone of interests protected by due process procedural requirements includes interests created by statute in favor of a generally-defined class.

It is the essence of law to define what interests or values are entitled to legal protection, as compared with moral, ethical or voluntary sanctions of approval,

and that the discharge of this quintessential function of the law rests not only in those evolving the scope of the common law but in the duly elected legislatures who may, within the limits set by constitutional restraints, enlarge on or supplant common law rules and protections.

As for precedent, it suffices to call the roll of the prominent decisions of the past decade: Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (unemployment compensation); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (tax exemption); Goldberg v. Kelly, *supra* (welfare benefits); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1972) (drivers' licenses); Department of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (June 25, 1973) (food stamps).

The significance of statutory protection is illuminated by the denial of procedural rights in the case of interests that have not been secured by statute, or authoritative regulation. In Board of Regents v. Roth, the Court declined to attach due process guarantees to the refusal to renew the one-year contract of a professor at a public university. 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The opinion, however, stresses the related consideration of lack of significant deprivation, and we move to that element.

### 3. *Extent of deprivation.*

What constitutes a deprivation of constitutional significance remains an abiding question. Long ago Mr. Justice Frankfurter expressed the view that a

---

33. See 407 U.S. at 81, 92 S.Ct. at 1994:

The requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking of a person's possessions. But the fair process of decisionmaking that it guarantees works, by itself, to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property inter-

ests can be prevented. It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . [And n]o better instrument 'as been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 170–172, 71 S.Ct. 624, 647, 95 L.Ed. 817 (Frankfurter, J., concurring).

"grievous loss" triggered due process protection, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951), and this phrase has been echoed in later opinions. *See, e. g.,* Goldberg v. Kelly, 397 U.S. at 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 287. At least where the Government's judicial machinery is used, any deprivation that cannot be characterized as *de minimis* is likely to require some form of notice and hearing. Fuentes v. Shevin, *supra,* 407 U.S. at 88–90, 92 S.Ct. 1983, 32 L.Ed.2d 556.

In examining the extent of deprivation, the Court has looked at the deprived party's ability to recover from it, at alternatives and self-help available.[34] Where alternative avenues are not easily opened, the Court has been more ready to regard the deprivation as sufficiently serious to warrant the imposition of a right to be heard. Thus in the employment context, for example, dismissal from a tenured job, or one carrying de facto tenure, a unique right to continued employment, not easily duplicated in the private sector, has called into play the right to some kind of hearing.[35] In contrast stand *Roth* and *Cafeteria Workers,* where the Court declined to extend procedural due process guarantees to discharged employees who were deemed to

be realistically free to seek similar employment elsewhere.[36]

The extent of deprivation has a qualitative and not a mere quantitative character. In the case of the poor, deprivations that may seem modest to the bulk of society may take on the character of "grievous loss" identified as a core factor in providing procedural protections. This feature of the law has been prominent in those cases which have overturned long settled practices by which commercial interests used summary legal procedures that had particularly weighty consequences in situations involving the poor. Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 33 L.Ed.2d 349 (1969); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).[37]

### D. *Constitutional Issues in the Housing Context*

We turn now to the cases that have considered the due process hearing issues in a housing context.

The first cases decided by the circuit courts of appeals have involved housing for low- and middle-income families, owned by private landlords, but subsidized under § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l*, by federal mortgage insurance assistance and

---

34. Exclusivity of the government benefit was most clearly presented in Boddie v. Connecticut, *supra,* in which the Court viewed the state as "monopolizing" the means by which the parties could adjust the marital relationship. See 401 U.S. at 374, 91 S.Ct. 780. More recent decisions indicate that the Court will not regard alternatives to receipt of a government benefit unavailable simply because the benefit is more attractive or convenient. In United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), the Court upheld a filing fee for bankruptcy cases, stating that "the government's control over the establishment, enforcement, or dissolution of debts [is not] nearly so exclusive as Connecticut's control over the marriage relationship in Boddie." 409 U.S. at 445, 93 S.Ct. at 638.

35. Slochower v. Board of Education, *supra,* (public college professor dismissed from an office held under tenure provisions) and

Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1973) (de facto tenure arising through implied promise of continued employment).

36. Board of Regents v. Roth, 408 U.S. 564, 575, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972), where Mr. Justice Stewart for the majority stated: "Hence, on the record before us, all that clearly appears is that the respondent was not rehired for one year at one University. It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another," *citing* Cafeteria Workers v. McElroy, 367 U.S. 886, 895–896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

37. *Sniadach* involved garnishment, almost exclusively used against poor, which can "drive a wage-earning family to the wall", 395 U.S. at 342, 89 S.Ct. at 1823. *Fuentes* involved summary replevin of household goods.

the provision of mortgages at below market interest rates. In Hahn v. Gottlieb, 430 F.2d 1243 (1970), the First Circuit rejected the tenants' assertion that they were entitled to a hearing before the Federal Housing Administration approved rent increases proposed by the landlord. Although the court noted that it regarded the potential injury to tenants as insubstantial,[38] it was most troubled by the rigidity which would be introduced into the rent-approval procedure if the court imposed "a formal hearing, the right to cross-examine adverse witnesses, and an impartial decision-maker, who must state the reasons for his decision . . .." 430 F.2d at 1248.

The tenants before us make a more modest request, not for a hearing with all the trappings of adjudication, but simply for "a fair opportunity to present their objections to any requested rental increases and to rebut any presentation made by the owner." We believe the proper course to follow in appraising the constitutional claim here is to consider first whether due process requires that the tenants be given *some* opportunity to be heard, and if some hearing is required, then to flesh out its characteristics after due consideration of the exigencies of the administrative process. *See* Davis, Administrative Law Treatise § 7.01 at 407–08 (1958).

In Langevin v. Chenango Court, Inc., 447 F.2d 296 (1971), the Second Circuit also rejected the claim that tenants of § 221(d) housing were entitled to a hearing before rent increases. For Judge Friendly, writing for the majority, the crucial fact was that the FHA was not increasing the rent but merely approving the landlord's proposal;[39] he regarded the Government involvement as insufficient to call forth due process protection. 447 F.2d at 301. Dissenting Judge Oakes found the distinction between Government increase and Government approval immaterial and went on to conclude that provisions for rent control in FHA regulations gave the tenants an interest worthy of due process protection.

The most recent decision, and the one that, like the case at bar, involved public housing, is Burr v. New Rochelle Municipal Housing Authority, 479 F.2d 1165 (2d Cir. 1973), in which tenants of a municipal public housing project asserted the right to a hearing before the housing authority imposed across-the-board rent increases. The Second Circuit, without dissent, held that the tenants were constitutionally entitled to present views to the Authority opposing the increases before they became effective. The court relied on Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir.), cert. denied 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970) which had held that tenants in municipal housing projects were entitled to an adjudicative hearing prior to a decision to refuse to renew their leases.[40] Thus, the Second Circuit seems to have distinguished between public housing and FHA-assisted private housing, a distinction this court declined to make earlier in this litigation when it was forecasting likely development of the law.[41]

Our own analysis of due process principles and precedents underscores the strength of the Second Circuit's result

---

38. *See* 430 F.2d at 1247.

39. The court relied on this fact to distinguish earlier cases, such as Escalera v. New York Housing Authority, 425 F.2d 853 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970), which had held that tenants in public housing are entitled to a hearing before their leases are terminated for breach of project regulations. The landlords in these cases were the government housing agencies.

40. Other decisions were in accord with *Escalara. See, e. g.,* Caulder v. Durham Housing Authority, 433 F.2d 998 (4th Cir.), cert. denied, 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed. 2d 539 (1971) ; Ruffin v. Housing Authority of New Orleans, 301 F.Supp. 251 (E.D.La. 1969).

41. McKinney v. Washington, *supra*, p. 628.

in *Burr,* without, however, retaining the Second Circuit's contrary approach in *Langevin.* These are the primary elements of our analysis:

1. The injury alleged by plaintiff-tenants in this case presents a substantial deprivation—the inability to pay the increased rentals or to find satisfactory substitute housing. While the tenants may be able to bear the burden of higher rentals by foregoing other purchases, the plaintiffs allege that this would cause them to forego necessities, reducing their welfare below a tolerable minimum. This, they argue, is exactly the situation Congress intended to alleviate by establishing a housing program for low-income families.

2. The interest which the plaintiffs have in obtaining adequate, decent housing is one conferred by the Housing Act. The scheme of rent control in public housing projects and annual Federal contributions to public housing projects, reviewed in Section A, *supra,* was designed to benefit low-income tenants. It differs in technique but not in ultimate objective from the benefit at issue in Goldberg v. Kelly, an income supplement to needy families. In the public housing program, Congress has chosen to reduce the price which needy families must pay for shelter, an essential commodity. In each case, an improvement in family welfare was the intended result.

3. Notwithstanding the substantiality of the tenants' interest and the seriousness of the alleged deprivation, a due process right to be heard would be inappropriate if the process of rent increases were such that tenants could make no contribution relevant to decision-making. The propriety of affording due process protection requires an assessment of the issues presented for decision when rent increases are sought and the capacity of tenants to present material relevant to resolution.[42]

The ·Housing Act, 42 U.S.C. § 1402, prescribes the following factors to be considered in setting rents: "(A) the family size, composition, age, physical handicaps, and other factors which might affect the rent-paying ability of the family, and (B) the economic factors which affect the financial stability and solvency of the project." Inclusion of the tenants' ability to pay as one factor to be considered means that tenants can make some material contribution to the process of fixing rents. Tenants may also be able to supply relevant information about the "economic factors," which would include the landlord's factor costs, the level of services which generate them, and the alternative sources of income which affect the project's balance sheet.[43] Moreover, tenants may make innovative suggestions for compromising

---

42. While many of the recent due process decisions have involved decisions about the status, rights, or obligations of single individuals, the determination which emerges from the governmental process under scrutiny here is not so individualized. We do not, however, regard this difference as determinative. We believe the correct approach is to ascertain whether tenants can make relevant contribution to the issues presented for decision, notwithstanding the fact that they apply to a potentially large class. *Compare* BiMetallic Investment Company v. State Bd. of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915) *with* Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 167, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

In BiMetallic Investment Company v. State Bd. of Equalization, *supra,* which held that taxpayers had no right to a hearing before execution of the agency's order to increase

the valuation of taxable property, Mr. Justice Holmes said that "[w]here a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption." 239 U.S. at 445, 36 S.Ct. at 142. But there the Court perceived the agency to be engaged in making general policy, of such a nature that the petitioners had no legitimate contribution. As Mr. Justice Frankfurter said, concurring in Anti-Fascist Refugee Committee v. McGrath, 341 U.S. at 167, 71 S.Ct. at 646, the *BiMetallic* holding stands for the proposition that "when decisions of administrative officers in execution of legislation turn exclusively on considerations similar to those on which the legislative body could itself have acted summarily, notice and hearing may not be commanded by the Constitution."

43. We agree with Judge Friendly that these matters constitute "adjudicative" rather than

competing interests. When landlords seek rent increases, the issue is not necessarily limited to that increase *vel non*. Potential modifications of a proposed rent schedule may relate, for example, to differentials based on family status and size. In this case, the tenants sought to persuade NCHA to defer rental increases to the summer months, when they could be borne more easily by families with seasonally-employed wage-earners.

It is thus apparent that we regard the due process claim of a public housing tenant to a hearing prior to government approval of rent increases as posing a substantial constitutional question.

E. *Existence and Nature of Tenants' Statutory Right to Hearing Prior to Approval of Rent Increases*

■ We hold that the tenants of public housing constructed under the National Housing Act are entitled under that statute to an opportunity to be heard before rents are increased.

Our discussion of constitutional issues in the previous section of this opinion has not resulted in a constitutional ruling, but it has informed our construction of the statute. We have already adverted to the doctrine of interpretation that avoids serious questions as to the constitutionality of Federal statutes. Furthermore, our construction of the Act furthers its purpose to provide public housing tenants with satisfactory and secure shelter, by surrounding the benefit with such procedural protection as comports with basic fairness, discerned in the light of the contemporary regulatory climate. By declining to place our holding on constitutional grounds, however, we preserve an opportunity for Congress to reexamine the issue, and to restructure opportunities for tenant participation so as to comport

with what it regards as administrative necessity, without inhibition by this ruling. Congress may, after thorough examination, conclude that tenant participation must yield to other interests. In that event, we may eventually be compelled to decide the constitutional question. For now, however, we believe that predicating the tenants' right to participate on the statute represents a sound approach.

Having concluded that the tenants have a right to be heard, we turn now to such specific considerations as the timing, forum, and specific methods of tenant participation. The fleshing out of these requirements, like the determination of a due process right itself, begins with a weighing of "the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), cited with approval in Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The interest of the tenants in participation is substantial, since they face grievous loss in a rent increase—even one that is small in absolute dollar amount. However, because the number of tenants potentially involved is quite large, we must be careful to shape procedures to protect the tenants' interests that avoid their becoming unduly burdensome.

1. *Timing and forum*

Tenants might make their case in one or both of two forums—before NCHA or HUD. Under the statutory scheme, the local housing authority takes the initiative in most matters of project management.[44] The LHA draws up its

---

"legislative" facts, to use the distinction proposed by Professor Davis, Administrative Law Treatise § 7.02 at 413 (1958). *Compare* Langevin v. Chenango Court, Inc., 447 F.2d 296 (2d Cir. 1971) *with* Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970).

44. Since 1959, the 1937 Housing Act has provided that "the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rents . . . ." should be vested in *local* public

own budget and proposes rent increases which are then submitted to HUD for review.[45] The local housing authority is familiar with the details of project operations. Its staff is likely to have more contact with tenants and their representatives than that of HUD. Thus the local housing authority is the more appropriate initial forum for the tenant. Allowing the tenants to present their views first to the local housing authority gives them an opportunity to influence the preparation of proposals at an early stage, before important issues have been foreclosed and objection has become a futile gesture.[46]

Presentation of the tenants' views before the local authority has the added advantage that submissions by the tenants will become part of the record which the LHA submits to HUD for review, thereby allowing HUD an opportunity to make a more informed decision. This approach is congruent with that of the Fourth Circuit in Appalachian Power Co. v. EPA, 477 F.2d 495 (4th Cir. 1973), approving a procedure for EPA approval of a state implementation plan under § 110 of the Clean Air Act. No hearings were held by EPA but it consulted hearings held at the state level in reaching its decision whether to approve the state plan.

Once the LHA decision is reached, HUD should permit tenants to submit expeditiously any objections to the LHA decision, so that HUD may be fully informed of tenant views. Ordinarily, at least, this will not constitute a right to present new evidentiary material to HUD.[47]

## 2. Procedures

In several prior cases, tenants coupled their demand for a right to be heard with the assertion that only an adjudicative hearing—replete with cross-examination, discovery, and inspection of evidence—would suffice. The courts, understandably troubled by such expansive claims, shied away from requiring hearings altogether. See Hahn v. Gottlieb, supra. The Second Circuit however, while holding in Burr v. New Rochelle Municipal Housing Authority, supra, that tenants have a right to be heard prior to rent increases, has limited the tenants' role to filing written objections to proposed increases after due notice is given. The court concluded that evidence in a rent increase proceeding would consist largely of technical financial data, evidence which could be most easily grasped in written form and for which the protection of spontaneous testimony was unnecessary.

Most of the cases which established a due process right to hearing were concerned with individualized determinations—suspension or revocation of licenses, termination of statutory benefits to individuals, dispossession of property. In those cases individual hearings, with some oral presentation, were well nigh indispensable to the airing of the critical questions. Where, as here, the issues involved affect a class of citizens, there is a need to impose some limits to keep the proceeding manageable. While it is impossible to anticipate all the issues which could be raised in a rent-increase dispute, tenants are most likely to

---

housing agencies. 42 U.S.C. § 1401 (1970). Until 1959 rents in public housing were administratively fixed at 20% of tenant's income by HUD's predecessors, and the 1959 Housing Act, 73 Stat. 680, § 503(a) increased discretion of the local authorities by delegating to them rent decisions. See H. Rep.No.86, 86th Cong., 1st Sess. 32–33, 155 1959).

45. Although it is true that in this case HUD first suggested a rent increase, the details of

the proposal were the initial responsibility of the NCHA.

46. See Goldberg v. Kelly, supra, in which the Court emphasized that presentation of opposing views at an early stage is particularly important.

47. In Appalachian Power Co. v. EPA, supra, the court found Congressional intent to avoid the delay of a subsequent and authority to remand for EPA to hear further evidence. 477 F.2d at 504.

be concerned with the landlord's costs, level of services, alternative sources of revenue, and tenants' ability to pay increased rent. On these matters, we believe, tenants will have adequate opportunity to express their views if they are afforded a hearing of the type prescribed by the Administrative Procedure Act for rule-making proceedings: an opportunity to make written presentations. We note that an opportunity of this sort has been held to protect the interests of claimants under a variety of circumstances. *See, e. g.,* United States v. Florida East Coast Railway, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); FCC v. WJR, 337 U.S. 265, 247–276, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949).

We have on occasion voiced the view that basic considerations of fairness may under exceptional circumstances require oral submissions even in a legislative-type proceeding. *E.g.,* American Airlines v. CAB, 123 U.S.App.D.C. 310, 317, 359 F.2d 624, 631–632 (en banc 1966), cert. denied, 385 U.S. 843, 87 S. Ct. 73, 17 L.Ed.2d 75 (1966); Walter Holm & Co. v. Hardin, 145 U.S.App.D.C. 347, 449 F.2d 1009 (1971).[48] Conceivably there may be instances of rent increase proceedings when the dictates of fairness will require an opportunity for limited oral presentations and perhaps the right to pose questions submitted through the hearing officer. Congress, of course, is free to provide expressly for such a proceeding or to authorize HUD or a LHA to structure a hearing

in which tenants would testify.[49] For the present, however, we require only written submissions, and conceive of oral presentation, if available at all, as the exception rather than the rule.

■ ·We hold that tenants of NCHA are entitled by the Housing Act to notice of proposed rent increases and an opportunity to respond in writing before rent increase proposals are forwarded to HUD for approval. Since no such opportunities were afforded the tenants here, the judgment of the District Court must be reversed.

## IV. THE CLAIM THAT RENTS "BEYOND FINANCIAL REACH" ARE UNAUTHORIZED

Appellants' second claim on appeal is that HUD was legally obligated by statute to increase its annual contributions to NCHA to cover the operating deficit rather than requiring NCHA to increase rents. Appellants point to 42 U.S.C. § 1402(1), that " 'low-rent housing' means decent, safe, and sanitary dwellings within the financial reach of families of low income . . .."[50] The rent increases, say appellants, will put public housing beyond the financial reach of at least some low-income tenants.

■ There is no doubt that HUD has authority to use annual contributions to meet operating deficits. Section 1410(a) of the Housing Act provides that HUD "may make annual contributions to public housing agencies to

48. There may be need, as well, for cross-examination by interested parties, at least if the proceeding involves specific issues of critical importance that cannot be adequately ventilated under a written statement procedure. *Compare* International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 629–631 (1972) *with id.* at 650–652 (concurring opinion).

49. *See* E. Gellhorn, Public Participation in Administrative Proceedings, 81 YALE L.J. 359, 376–83. Fears of administrative im-

practicability tend to be overstated, as then Judge Burger noted in Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 340, 359 F.2d 994, 1006 (1966). Ad hoc rules of procedure can generally be devised to keep a hearing manageable under foreseeable contingencies—such as a congestion of witnesses or an unanticipated impasse.

50. This language was amplified by the 1969 Brooke Amendment, inapplicable to this case.

assist in achieving and maintaining the low-rent character of their housing projects." This language gives HUD authority to subsidize operating deficits, as well as interest for LHA bondholders.[51] But although HUD has had authority to use annual contributions to subsidize operating deficits, funds appropriated by Congress have not been sufficient to make this a realistic possibility. We see nothing compelling HUD to use annual contributions to subsidize deficits.

The Housing Act has never prescribed income limits for eligibility of low income tenants. Prior to 1969, § 1402(1) provided that

> income limits for occupancy and rents shall be fixed by the public housing agency and approved by the Authority after taking into consideration (A) the family size, composition, age, physical handicaps, and other factors which might affect the rent-paying ability of the family, and (B) the economic factors which affect the financial stability and solvency of the project.

Plainly, there are no income limits for occupants here. Nor did the statute, at the time of these increases, impose any ceiling for rents in public housing. The Brooke Amendment set such a limit for the first time—providing that rents "may not exceed one-fourth of the family's income, as defined by the Secretary" —but this provision is not applicable to the 1969 rent increase before us.

 In the absence of any statutory provision defining income limits for eligible families or imposing rent ceilings, it is difficult to make the claim that HUD was prohibited from increasing the rents and thereby causing some low-income families to forego purchasing this housing. Appellants rely on the general language of § 1402(1)(A) that low rent housing be "within the financial reach of families of low income." But this general language must be read together with the language requiring HUD to set rents in view of "the financial stability and solvency of the project."[52] Section 1402 simply states the competing objectives of improving the welfare of low-income families, on the one hand, and of conserving resources on the other. The statute entrusts to the discretion of HUD the reconciliation of these competing objectives in their particular applications.[53] Lacking sufficient operating subsidies, local housing authorities could well face bankruptcy by refusing to raise rents. Tenants have not alleged that there were sufficient funds available, and on this record HUD's decision to avoid this result cannot be held beyond its statutory power.[54]

---

51. The Brooke Amendment of 1969, which took effect after this litigation began, placed a ceiling on the annual contributions to a project, irrespective of their purpose. Amendments added in 1972 abolished the ceiling, since funds were authorized specifically for financing operating deficits. P.L. 92–503, 86 Stat. 906, sec. 3. Congress increased by $150 million the authority of HUD to enter into annual contribution contracts, and the Senate Report stated:

> The new authority may be used by the Secretary either to finance additional public housing units or to provide additional subsidies to housing authorities to meet current justifiable operating deficits.

S.Rep.No.92–1261, 92nd Cong., 2d Sess. 3 (1972).

52. 42 U.S.C. § 1402(1).

53. A different question would be presented if rents were increased so much that the housing could no longer be characterized as "low rent housing"; that question is not presented by the case before us.

54. See R. Pozen, note 9 supra, at 1227 Appendix, showing that, based on information from the National Association of Housing

A wholly different controversy would be presented if it were alleged that sufficient appropriated funds were available to avoid rent increases, but were wrongfully bypassed or ignored. The issues raised by such an "impoundment" should not be considered in the absence of clear cut allegations and a record, and if that is the controversy that appellants have in mind meaningful amendment of pleadings and tender of proof would be required. That would provide an opportunity for the Government to make a focused response, perhaps to show that the allegedly unspent funds were spent, or earmarked, or were in the course of being shaped for disbursement under plans or programs that would be jeopardized by acceptance of plaintiffs' claims.

Similarly, plaintiffs would have to supplement and update their pleadings if they wish to present the contention that the rent schedules under attack were in violation of the Brooke Amendment. The case was presented on the theory that the schedules were illegal when set, and we cannot on our own reconstitute the pleadings to allege that the rent ceilings, however lawful when set, became illegal when they were maintained after the passage of the Brooke Amendment.

\* \* \*

For the reasons set forth in Section III E of this opinion, the judgment of the District Court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

So ordered.

and Development Officials (NAHRO), a group representing LHA's Congressional appropriations earmarked for operating subsidies were below the estimated need for such subsidies by $19.6 million in fiscal 1970, $92 million in fiscal 1971, $103 million in fiscal 1972, and $155.4 million in fiscal 1973. We are interested in fiscal years 1969 and 1970, since the amount of rent increase in 1969 was predicated not only on the past operating deficit but on the projected operating deficit for the forthcoming year. We have no data on 1969 operating deficits nationwide, so we cannot reach a final conclusion on this question. We can only observe that the trend of the data would seem to indicate that all money properly available for financing operating deficits was spent. *See* text at note 21.