504 F.2d 483
 GENEVA TOWERS TENANTS ORGANIZATION, an unincorporated
association, et al., Plaintiffs-Appellees,
v.
FEDERATED MORTGAGE INVESTORS, and Geneva Apartments, Inc.,
et al., Defendants-Appellants.
GENEVA TOWERS TENANTS ORGANIZATION, etc., et al., Plaintiffs-Appellees,
v.
George W. ROMNEY, Individually and in his capacity as
Secretary of Housing and Urban Development, et
al., Defendants-Appellants.
GENEVA TOWERS TENANTS ORGANIZATION, an unincorporated
association, et al., Plaintiffs-Appellants,
v.
FEDERATED MORTGAGE INVESTORS, et al., Defendants-Appellees.
Nilda KELLER et al., Plaintiffs-Appellees,
v.
George W. ROMNEY, Individually and in his capacity as
Secretary of Housing and Urban Development, and James H.
Price, Individually and in his capacity as Director, San
Francisco Area Office, Department of Housing and Urban
Development, Defendants-Appellants.
Nilda KELLER et al., Plaintiffs-Appellees,
v.
KATE MAREMONT FOUNDATION, Defendant-Appellant.
Nilda KELLER et al., Plaintiffs-Appellants,
v.
KATE MAREMONT FOUNDATION et al., Defendants-Appellees.
 Nos. 72-2338, 72-2270, 72-2314, 72-2756, 72-2784 and 72-2788.
 United States Court of Appeals, Ninth Circuit.
 Oct. 2, 1974.
 
 Ronald R. Glancz (argued), Civil Div., U.S. Dept. of Justice, Washington, D.C., for appellants in 72-2270 and 72-2756 and for appellees in 72-2314.
 David B. Bryson (argued), National Housing and Economic Development Law Project, Berkeley, Cal., for appellees in 72-2270, 72-2338, 72-2784 and 72-2756 and for appellants in 72-2314 and 72-2788.
 Sal C. Balistreri (appeared), San Francisco, Cal., for appellees in 72-2314 and for appellants in 72-2338.
 Allan M. Berland (argued), of Elkus & Berland, San Francisco, Cal., for appellant in 72-2784 and for appellee in 72-2788.
 Before HUFSTEDLER and CHOY, Circuit Judges, and TAYLOR,* District judge.
 CHOY, Circuit Judge:
 
 
 1
 This is a consolidated appeal by tenants in two federally financed housing projects: Geneva Towers Appartments and Crescent Park. In two district court actions, they sought rescission of rent increases granted their landlords by the Federal Housing Administration (FHA) and an injunction compelling the federal defendants to grant the tenants a full and fair hearing prior to the implementation of the rent increases. They also sought a declaratory judgment that the actions of their landlords in applying for and the FHA in granting the rent increases violated the National Housing Act, the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment. The district court in each case ruled that the Due Process Clause requires: (1) that tenants be given notice of their lessor's application for approval of a rent increase; (2) that tenants have a reasonable opportunity to make written objections; and (3) that tenants be furnished with a concise statement of the FHA's reasons for approving an increase.[1] All parties appealed. The landlords and the government contend that the district courts improperly established procedures for tenant review of rent increase applications. The tenants reassert their argument for fullscale hearings.[2] We affirm.
 
 
 2
 Geneva Towers and Crescent Park were financed by the federal government pursuant to 221(d)(3) of the Housing Act of 1961, 12 U.S.C. 1715l(d)(3). Congress determined that there are many families who have sufficiently high incomes to preclude them from eligibility for low-rent public housing, but who cannot afford home ownership even if assisted by conventional FHA insurance.[3] Section 221(d)(3) was designed to assist private industry in providing housing for these low and moderate income families and, in addition, persons displaced by urban renewal.[4] The means Congress chose were the incentive of subsidized interest rates, 12 U.S.C. 1715l(d)(5), and certain tax advantages.[5]
 
 
 3
 Those eligible to receive subsidized mortgages include nonprofit corporations, such as the Kate Maremont Foundation, and limited dividend corporations, such as Geneva Apartments, Inc. See 24 C.F.R. 221.510 (1973). Congress decided that the benefits of federal financing would be available only where mortgagors operated the projects subject to controls on admissions, rents and profits.[6] Therefore, the FHA has promulgated extensive regulations governing 221(d) (3) developments. The regulations prescribe the form and content of mortgage instruments, wage labor and construction standards, occupancy requirements and priorities, and establish federal controls over capital structure, rate of return on investment and rents. See 24 C.F.R. 221.502-749 (1973).
 
 
 4
 Geneva Apartments, Inc. and Kate Maremont Foundation each signed the standard regulatory agreement to receive federal financing of its project. The agreement implements the regulatory provisions outlined above and, with respect to rent increase applications, provides:
 
 
 5
 The Commissioner will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:
 
 
 6
 Approve a rent schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance expenses over which the owners have no effective control, or (2) Deny the increase stating the reasons therefore.[7]
 
 
 7
 The goal is to provide reasonable charges to tenants and a fair return to the mortgagor.[8]
 
 
 8
 Both landlords applied for and were granted rent increases. In neither case were the tenants given notice of the application or an opportunity to participate in the determination of a rent increase. No FHA procedure, regulation or federal statute provides for tenant participation. The issues presented on this appeal are: (1) whether there is sufficient governmental participation and involvement to subject 221(d)(3) projects to the due process clause; (2) whether the tenants' interest in not having their rents increased is a constitutionally protected 'property interest'; and if so (3) what procedural safeguards does due process require to protect that interest.
 
 I. GOVERNMENT INVOLVEMENT
 
 9
 The Due Process Clause of the Fifth Amendment applies to and restricts only the federal government and not private persons. Public Utilities Comm'n v. Pollak, 343 U.S. 451, 461, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). The standards utilized to find federal action for purposes of the Fifth Amendment are identical to those employed to detect state action subject to the strictures of the Fourteenth Amendment. See United States v. Davis,482 F.2d 893, 897 n. 3 (9th Cir. 1973). What is 'private' action and what is 'state' action is often difficult to determine. See Evans v. Newton,382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). 'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.' Burton v. Wilmington Pkg. Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). Burton held that where a state-owned and operated parking facility leased a portion of its building to a coffee shop which engaged in racial discrimination, the state so far insinuated itself into a position of interdependence as to be a joint participant in the unconstitutional activity. Therefore, the Fourteenth Amendment was applicable. The interdependence was principally financial. The rents paid by the shop partially defrayed the cost of the public facility and enhanced its success. Improvements by the shop did not result in increased taxes to it because the fee was held by a tax-exempt government agency. There were a variety of incidental mutual benefits.
 
 
 10
 Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), reveals a situation distinguishable from the symbiotic relationship in Burton. The Court held that a state-issued liquor license with accompanying regulation did not amount to sufficient state involvement to require the application of the Fourteenth Amendment. The Lodge was aprivate club in its own building without public funding. The state regulation did not make the state a partner in the club's enterprise. Id. at 177, 92 S.Ct. 1965.
 
 
 11
 Analysis of the facts and circumstances in the instant cases discloses sufficient government involvement in the 221(d)(3) program to subject the activities of the landlords to the Fifth Amendment. Private investors such as Geneva Apartments, Inc. and Kate Maremont Foundation, are engaged in a joint undertaking with the federal government to provide housing for low and moderate income families. Participation in the 221(d)(3) program subjects the investors to an elaborate and pervasive body of government regulations. The benefits are mutual. The investors are able to construct facilities aided by government financing, below-market interest rates and tax advantages. The government alleviates the housing crisis and insures compliance with its goal through a monitoring system that commences with construction of the housing and does not terminate until the mortgagors' obligations are satisfied. The 221(d)(3) program is not merely a case of government subsidization but an independent relationship comparable to that found in hospital construction under the Hill-Burton Act.[9] We hold the Fifth Amendment applicable to these 221(d) (3) projects. Accord McQueen v. Druker, 438 F.2d 781, 784-785 (1st Cir. 1971); Harlib v. Romney (N.D.Ill., March 6, 1973); Paulsen v. Coachlight Apartments Co. (W.D.Mich., March 8, 1973); Colon v. Tomkins Square Neighbors, Inc., 294 F.Supp. 134, 137-138 (S.D.N.Y.1968); Note, Procedural Due Process in Government-Subsidized Housing, 86 Harv.L.Rev. 880, 895-96 (1973); see Langevin v. Chenango Court, Inc., 447 F.2d 296, 304 (2d Cir. 1971) (Oakes, J., dissenting); McClellan v. University Heights, Inc., 338 F.Supp. 374, 380-382 (D.R.I.1972). But see Langevin v. Chenango Court, Inc., supra at 301.
 
 II. TENANTS' PROPERTY INTEREST
 
 12
 The Supreme Court, in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970),[10] enunciated a twostep process for analyzing cases involving the deprivation of a governmental benefit. First, it must be ascertained whether the interest at issue is a constitutionally protected 'property' or 'liberty' interest. See id. at 262, 90 S.Ct. 1011.[11] Second, if the interest is a protected one, the beneficiary's interest in avoiding loss must be balanced against the government's interest in summary adjudication. Id. at 262-266, 90 S.Ct. 1011.[12] See generally Note, supra, 86 Harv.L.Rev. at 889.
 
 
 13
 The Court recently elaborated upon the first requirement of Goldberg v. Kelly in announcing broad guidelines for the assessment of 'property interests'-- Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Roth was a nontenured teacher who completed a one year term of employment and was not rehired. State law required four years of year-to-year employment prior to tenure and entitled a new teacher to nothing beyond one academic year. The Court made clear 'that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money, . . . Yet . . . the Court . . . has at the same time observed certain boundaries.' Board of Regents v. Roth, supra 571-572, 92 S.Ct. 2171 at 2706. Certain attributes of 'property interests' were delineated:
 
 
 14
 To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a nuilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined . . .. Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.
 
 
 15
 Id. at 577, 92 S.Ct. at 2709. Roth's rights were defined by his appointment, and the Court held that he had merely an abstract concern and not a 'property interest' in being rehired. Therefore, he was not afforded procedural due process.
 
 
 16
 Sindermann had taught in the Texas state college system, a system without formal tenure, for ten years. The Court remanded the case after finding that rules and understandings concerning teacher reappointment could have created a de facto tenure program objectively justifying Sindermann's legitimate claim of entitlement to continued employment. Perry v. Sindermann, 408 U.S. at 601-603, 92 S.Ct. 2593.
 
 
 17
 Thus Roth requires more than an abstract need or unilateral expectation of a benefit. And Sindermann demonstrates that the source need not be explicit but can be implicit in the overall workings of a governmental program. Accord, morrissey v. Brewer, 408 U.S. 471, 479, 481-482, 92 S.Ct. 2593, 2599 (1972) (interest of parolees in continued liberty qualifies for protection; 'implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole.' The touchstone is whether those seeking the protection of the Fifth Amendment have a legitimate, objectively justifiable claim to the benefits of the governmental program.[13]
 
 
 18
 We think the tenants of 221(d)(3) housing do have such a claim, and it lies in their expectation, statutorily created, that they will continue to receive the benefits of low cost housing.
 
 
 19
 Section 221(d)(3) plainly contemplates that low and moderate income tenants are to be its principal beneficiaries; as the statute's statement of purpose declares, the program is 'designed to assist private industry in providing housing for low and moderate income families and displaced families.' 12 U.S.C. 1715l(a). See generally Marshall v. Lynn, 497 F.2d 643 (D.C.Cir. 1973). Section 221 was originally enacted as a part of the National Housing Act of 1954, 68 Stat. 599. It established means of providing housing for families displaced by urban renewal. See National Housing Act of 1954, P.L. 560, 221(a), 68 Stat. 599 (1954); Conf. Report, H.Rep.No. 2271, 83rd Cong., 2d Sess. 70 (1954). So, at the outset the purpose of the program was to benefit a class of individual tenants. In 1961 the class of beneficiaries was broadened to include those of low and moderate income in addition to those displaced by urban renewal. See Housing Act of 1961, P.L. 87-70, 75 Stat. 149 (1961). The concern, however, was still with benefitting the individual tenants expected to occupy subsidized housing. The House Report emphasizes this in setting forth for whom the program was created:
 
 
 20
 There are many families whose incomes are sufficiently high so that they are not eligible for low-rent public housing but who . . . also cannot afford apartment-type housing even of modest design if it is financed at the going FHA interest rate and subject to the regular FHA insurance premium.
 
 
 21
 H.Rep. No. 447, 87th Cong., 1st Sess. 11 (1961); S.Rep. No. 281, 87th Cong., 1st Sess. 7 (1961), U.S.Code Cong. & Admin.News, p. 1929. In short, there can be little doubt that Congress intended to endow those occupying the housing with some form of benefit. Compare Marshall v. Lynn, supra (221(d)(3) intended to benefit individual tenants) with Tenants Council of Tiber Island-Carrollsburg Square v. Lynn, 497 F.2d 648 (D.C.Cir., 1973) (220 of the National Housing Act, 12 U.S.C. 1715k, primarily intended for urban renewal purposes and not to aid individual tenants of the projects).[14]
 
 
 22
 Since entitlement under the Roth-Sindermann analysis depends on a right to the specific benefit the deprivation of which is threatened by the government, the next question is what type of benefit did Congress intend to bestow upon the tenants of 221(d)(3) housing. Congress' purpose was, again quite clearly, to provide the tenants with the benefit of low cost housing. The source of the tenants' entitlement is explicit: it lies in the congressionally stated purpose of providing persons of meager economic means with low-priced housing, see 12 U.S.C. 1715l(a), and the statutory requirement that the FHA regulate the rents charged by the private developer. See 12 U.S.C. 1715l(d)(3). The legislative history buttresses this conclusion. As the 1961 House Report stated it:
 
 
 23
 The below-market interest rate and reduction of FHA mortgage insurance premiums would be made available only where the mortgagors (are willing to) operate the housing subject to related controls on rentals and income limits for admission of tenants to the housing.
 
 
 24
 H.Rep. No. 447, supra at 11; S.Rep. No. 281, supra at 8, 1961 U.S.Code Cong. & Admin.News, p. 1930. The tenants of 221(d)(3) housing sign leases with the expectation-- created by the congressional commands-- that rents will be kept as low as economically feasible. Therefore, even more so than with the type of implicit expectations giving rise to property rights in Sindermann and Morrissey, the tenants of 221(d)(3) housing have an objectively justifiable right to low cost housing. Accord, Burr v. New Rochelle Municipal Housing Authority, 479 F.2d 1165, 1167-1168 (2d Cir. 1973); Paulsen v. Coachlight Apartments Co., (W.D.Mich., March 8, 1973); Note, supra, 86 Harv.L.Rev. at 896; see Mrshall v. Lynn, supra; Thompson v. Washington, 497 F.2d 626 (D.C.Cir. 1973).
 
 III. PROCEDURAL DUE PROCESS
 
 25
 The second step of the Goldberg analysis requires that we determine what form of procedural due process need be accorded tenants of a 221(d)(3) project. This calls for an analysis of three factors: (1) the importance of the tenants' interest; (2) the input the tenants can make in the adjudicatory process; and (3) the governmental interest at stake.[15]
 
 
 26
 The interest of the tenants in procedural safeguards is substantial. They seek to retain decent housing at a price that is within their power to pay. A rise in the cost of housing could force tenants to forego other perhaps necessary purchases and could even force some tenants to seek other less expensive housing. Moreover, the tenants desire to insure that any rent increase is fairly justified by all the relevant data. And, not the least important, affording the tenants some participation in the rent adjustment process 'generat(es) the feeling . . . that justice has been done.' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); see also U.S. Dep't. of Housing and Urban Development, Management of HUD-Insured Multifamily Projects Under Section 221(d)(3) & Section 236, A HUD Guide, No. HM G 4351.1 at 209 (1971).
 
 
 27
 As to the input tenants can make, rent determination is based in significant part upon various technical factors. See id. at 209. Tenants can contribute little to such calculations. This argues for giving the tenants less than a full-dress hearing. But it does not mean that they should be denied any role whatsoever. The FHA must also consider whether increased expenses have occurred and whether unnecessary expenses have been minimized, for the FHA will only entertain rent increases when justified by expenses 'over which owners have no effective control.' Id.[16] Moreover, a rent increase hinges on whether there are any violations of the Regulatory Agreement and whether the property is being adequately maintained. U.S. Dep't of Housing and Urban Development, Insured Project Servicing Handbook, a HUD Handbook, No. RHM 4350.1 Supp. 1 at 3, 5 (1970). Obviously, tenants are in a good position to know the facts relative to these matters. Hence, this factor justifies some limited tenant involvement.
 
 
 28
 The government's interest is also substantial. It is to preserve the flexibility of the 221(d)(3) program, for if the program becomes encumbered with bureaucratic obstacles, private investment in the program may be significantly deterred.
 
 
 29
 However, we find, as did the district courts, that the government's interest is not sufficient to outweigh entirely the need-- and helpfulness-- of permitting tenants a limited right of intervention. A full-dress hearing is not necessary. The potential for lengthy delay if a hearing precedes a rent increase would be particularly great with such a requirement especially considering the sheer number of tenants involved. Moreover, as we have said, the tenants' contribution is not likely to be as important as, say, that of the welfare recipient in Goldberg v. Kelly, because of the technical issues which are a part of a rent determination. However, 'the formality and procedural requisites for (a due process) hearing can vary, depending upon the importance of the interests involved and the nature of . . . subsequent proceedings.' Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The tenants' substantial interest in low cost housing added to the contribution they can make on certain rent adjustment issues requires, we think, that they be given notice of the rent increase, an opportunity to make written objections and receipt of a concise statement of the FHA's reasons for its action, as the two district judges here specified.
 
 
 30
 Furthermore, the tenants must be given notice of the proposed rent increase and a right to reply before the FHA approves the landlord's request. Although Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), has perhaps cast doubt on the continued vitality of the 'presumption' in cases like Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586 (1971) and Boddie v. Connecticut, 401 U.S. at 378-379, 91 S.Ct. 780, in favor of pre-action notice and opportunity for hearing,[17] the balancing process in this case leads nonetheless to the pre-deprivation result.[18] Here, there is no grave danger that providing an opportunity for written objections will significantly delay justified rent increases and, therefore, deter investment in 221(d)(3) housing; indeed, the danger is remote at best. True, it could be argued that the tenants' countervailing interest is minimal, for if the tenants are given a post-increase right to challenge and the rent is then rolled back, their deprivation will only be temporary. But 'the extent of deprivation has a qualitative and not a mere quantitative character.' Thompson v. Washington, 497 F.2d at 636. A slight deprivation to most of us may be very serious to a poor person. See Burr v. New Rochelle Municipal housing Authority, 479 F.2d at 1168 (increase of rent in public housing); Hunt v. Edmunds, 328 F.Supp. 468 (D.Minn. 1971) (reduction of welfare benefits); Woodson v. Houston, 27 Mich.App. 239, 183 N.W.2d 465 (1970) (same); but see Hahn v. Gottlieb, 430 F.2d 1243, 1247 (1st Cir. 1970). In that sense it is like the form of pre-judgment wage garnishment condemned in Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). There too the deprivation would have been temporary if the wage-earner had ultimately prevailed, but, as the Court observed, that temporary loss could 'as a practical matter drive a wage-earning family to the wall.' Id. at 341-342, 89 S.Ct. 1820, 1823. Here also a temporary deprivation could have very serious effects, serious enough, we think, to require the procedural safeguards outlined by the district courts.[19]
 
 
 31
 Affirmed.
 
 HUFSTEDLER, Circuit Judge (dissenting):
 
 32
 These tenants present a sympathetic case. Rent increases beyond their means threaten them with the loss of the housing they now enjoy, and the prospects are bleak for their finding adequate replacements. Their plight is of no less concern because it is shared by tens of thousands of other tenants whose incomes have not kept pace with spiraling inflation and to whom no recourse to the procedural protections of the Fifth and Fourteenth Amendments is available because neither a state nor the federal government is significantly involved in their housing arrangements. The Supreme Court has made it clear, however, that the fact alone that one suffers grievous loss because of a governmental act does not give the injured person a right to prior notice and hearing. (Compare Board of Regents v. Roth (1972) 408 U.S. 564, 92 S.Ct. 2701 with Joint Anti-Fascist Refugee Committee v. McGrath (1951) 341 U.S. 123, 168, 71 S.Ct. 624 (Frankfurter, J., concurring).) Furthermore, these tenants are not the only low and moderate income housing consumers with interests in the outcome of this controversy; other such housing consumers will be adversely affected if these tenants prevail. Sympathy for these plaintiffs, therefore, cannot substitute for careful analysis of the nature and the legal consequences of their interests.
 
 
 33
 I agree with the First and Second Circuits and with the majority in the cases at bench that the tenants have no statutory right to notice and an evidentiary hearing anteceding rental increases (Hahn v. Gottlieb 1st Cir. 1970) 430 F.2d 1243; Langevin v. Chenango Court, Inc. (2d Cir. 1971) 447 F.2d 296.) If the tenants are to have a right, it must be founded on the Constitution. I also agree with my brothers that the federal government is sufficiently enmeshed in the housing projects before us that the Fifth Amendment can be invoked. (See Public Utilities Comm'n v. Pollak (1952) 343 U.S. 451, 72 S.Ct. 813; Adams v. Southern California First Nat'l Bank (9th Cir. 1974) 492 F.2d 324, 340 (Hufstedler, J., dissenting from denial of hearing en banc).) However, I disagree that the nature of the interests asserted by these tenants is such that the Fifth Amendment can be applied to require their landlords or the Government to give them notice and opportunity to be heard before rental increases can be approved and effected.
 
 I.
 
 34
 The tenants have a right to prior notice and hearing only if they have 'a legitimate claim of entitlement' to the governmentally conferred benefit. (Board of Regents v. Roth, supra, 408 U.S. at 577, 92 S.Ct. 2701.) The search for a definition of entitlement is elusive because the concept has only recently emerged and in its present formative stage its features are not fully discernible. To say that interests are entitlements only if they are property interests (see id.) is not a useful definitional tool because the term 'property' embraces multiple concepts that have differing consequences depending upon the kind of 'property' involved and the setting in which the concepts are invoked.[1] In the entitlement context, the property label does little more than alert the reader to the court's conclusion that, whatever entitlement is, it is within the protection afforded by the due process clauses of the Fifth and Fourteenth Amendments. The appellation provides no assistance in deciding what kinds of interests in governmentally conferred benefits can become entitlements.
 
 
 35
 Although comprehensive definition of the entitlement concept is not yet possible, the contexts in which prior notice and hearing have or have not been required provide guidance in determining the kinds of interests that are entitlements. An interest that gives rise to an entitlement is always a conditional interest,[2] but not all conditional interests in governmental benefits give rise to entitlements. To create an entitlement, the law must remove the decision to grant the benefit from agency discretion. (See, e.g., Arnett v. Kennedy (1974) 416 U.S. 134, 181-182, 94 S.Ct. 1633, 40 L.Ed.2d 15 (op'n of White, J.) (government employment terminable at will of government not subject to prior notice and hearing).)
 
 
 36
 It is not sufficient, however, that there be a legal requirement that mandates conferral of the benefit; the legal requirement must be one that the beneficiary may insist upon at a hearing. (See Perry v. Sindermann (1972) 408 U.S. 593, 601, 92 S.Ct. 2694.) Every remedial statute directly and indirectly confers benefits on numerous people. Although conferral of an actual benefit may be essential to the creation of an entitlement, not all recipients of actual benefits have entitlements. Benefits arising from a statute that can become entitlements should be restricted to those benefits conferred on those beneficiaries to whom Congress intended to extend some kind of enforceable interest or, to put it slightly differently, to whom Congress intended to create a governmental obligation.[3]
 
 
 37
 Thus, a unilateral expectation of continued conferral of a benefit is not an entitlement. (See Board of Regents v. Roth, supra, 408 U.S. at 577, 92 S.Ct. 2701.) The majority errs in implying that an expectation that is reasonable in the light of the purpose of the law from which the benefit flows is an entitlement. Reasonableness of an expectation in absence of some kind of binding legal requirement (cf. Restatement of Contracts 90) is not enough to generate an entitlement. (Cf. Perry v. Sindermann, supra, 408 U.S. at 601-602, 92 S.Ct. 2694.) The governmental obligation may arise from statute, contract, or common law. (See id.) It may be explicit, or it may be implicit, as for example, a legal obligation based on implied contract (see id.; cf. Morrissey v. Brewer (1972) 408 U.S. 471, 92 S.Ct. 2593), or on a statutory scheme that, by granting power to terminate benefits under certain circumstances, implicitly disallows termination in all other circumstances. (See id.; Goldberg v. Kelly, supra, 397 U.S. 254, 90 S.Ct. 1011.)
 
 
 38
 The nature of due process, however, indicates that entitlements involve a component in addition to the existence of an enforceable right. Due process is a practical concept; prior notice and hearing are not required when a hearing would be pointless. The purpose of a prior evidentiary hearing in the entitlement context is to resolve those questions of fact upon which a controversy turns; if there are no material issues of fact to be resolved, a prior evidentiary hearing to determine the existence of facts is meaningless, and the very purpose of requiring procedural due process guarantees evaporates. (See K. Davis, Administrative Law Treatise 7.01 (1958 & Supp.1970); cf. Greene v. McElroy (1959) 360 U.S. 474, 496, 79 S.Ct. 1700, 3 L.Ed.2d 1377.) The substantive law from which the benefit springs of course determines what factual issues are material. (See, e.g., J. Wigmore, Evidence 2, at 6-7 (3d ed. 1940).) For a fact to be material, there must be a legal requirement that the benefit be conferred if the fact is established. Unless such a legal requirement exists, there is nothing meaningful for an evidentiary hearing to resolve. Unless the law requires that consequences follow from the proof of a fact, that fact is immaterial to resolution of a conflict; whether the fact is proven or disproven at the hearing has no necessary impact on the outcome of the controversy. In sum, only those interests can become entitlements that are conditional upon the continued existence of one or more controvertible and controverted facts.[4] If none of the material facts is, or could be, controverted, there is no significant issue for a prior hearing to resolve.[5] (Cf. Board of Regents v. Roth, supra, 408 U.S. 564, 92 S.Ct. 2701 (Roth's right to continued employment was conditioned on whether the contractual termination date had arrived; Roth did not claim that the date had not arrived).)
 
 
 39
 Thus, if the beneficiary shows that he is the recipient of a governmentally conferred benefit that is rooted in a legal obligation and that the legal obligation conditions his initial or continued receipt of the benefit on the existence of a controverted fact, he has an entitlement, and he must be accorded prior notice and an opportunity to be heard for the purpose of resolving the controverted factual issue. (E.g., Arnett v. Kennedy, supra, 416 U.S. 134, 94 S.Ct. 1633 (right to employment conditioned on absence of sufficient cause for dismissal); Perry v. Sindermann, supra, 408 U.S. 593, 92 S.Ct. 2694 (same); Morrissey v. Brewer, supra, 408 U.S. 471, 92 S.Ct. 2593 (right to freedom from incarceration conditioned on absence of violation of parole conditions); Goldberg v. Kelly, supra, 397 U.S. 254, 90 S.Ct. 1011 (right to welfare conditioned on claimant's meeting eligibility requirements).)
 
 
 40
 From these principles we can draw a working definition of an entitlement: An entitlement is a legally enforceable interest in receiving a governmentally confrred benefit, the initial receipt or the termination of which is conditioned upon the existence of a controvertible and controverted fact. Such an interest cannot be imparied or destroyed without prior notice to the beneficiary and a meaningful opportunity for him to be heard for the purpose of resolving the factual issue.
 
 II.
 
 41
 These tenants have not met the criteria for claiming an entitlement. They are recipients of some governmentally conferred benefits, but the conferral of these benefits is not controlled by the requisite kind of legal requirement and, more importantly, even if there were an appropriate legal requirement, it would not give rise to the kind of enforceable obligation that could ripen into an entitlement.
 
 
 42
 The benefits which the tenants received are occupancy of housing that would not have been available had not section 221 of the Housing Act been enacted and their expectation that rental increases would not be permitted without FHA approval under standards that could be promulgated by the FHA.
 
 
 43
 The tenants did not receive a benefit that their rents could not be increased during their tenancy, because the statute itself contemplated that rents could thus be raised. Nor can the tenants claim that rents could not be increased beyond the ability of any individual tenant or groups of tenants to pay because, while Congress wanted to make housing available to members of a class consisting of low and moderate income groups, Congress did not gear rent levels to the budgets of individual members of the class or to the means of subclasses within the overall class. Indeed, it was contemplated that rent raises might deprive some of the tenants of the ability to remain in a project.
 
 
 44
 To have an entitlement to low rents, these tenants must assert a legal requirement that would render a rent increase improper under disputable and disputed facts. However, the statute merely requires that the Secretary in his discretion may regulate rents (12 U.S.C. 1715l(d)(3)); it does not fix or require the Secretary to fix specific factual standards under which rents are to be regulated. The regulations adopted to implement the rent control requirement reflect the need for flexibility that is implicit in the statute. The only regulation that does more than paraphrase the statute, 24 C.F.R. 221.531(c), does not apply to these projects (compare 24 C.F.R. 221.510(a), (c), (e) with id. 221.531, 221.532(a)) and does no more than indicate that certain factors are to be balanced in rent control decisions. The HUD handbook on which the tenants rely appears not to be legally binding (see Thorpe v. Housing Authority (1969) 393 U.S. 268, 275, 89 S.Ct. 518, 21 L.Ed.2d 474), and it does no more than enumerate factors that generally are to be considered. Finally, the regulatory agreement imposes no requirement that rent increase requests be denied in certain circumstances; rather, it requires that rent increases be granted at least in certain circumstances and, if denied, that the denial be communicated in a stated manner.
 
 
 45
 In dealing with statutes that confer direct aid upon identified classes of persons, such as welfare and veterans' benefit statutes (e.g., Goldberg v. Kelly, supra, 397 U.S. 254, 90 S.Ct. 1011), it is reasonable to infer, in the absence of expressed intent, that Congress intended those direct beneficiaries to have legally enforceable interests in such benefits as long as the beneficiaries' eligibility continued. Granting the beneficiary a legal interest assures that each beneficiary receives the benefit that Congress intended to give him. Attaching due process protections to the vindication of the right promotes, rather than impairs, the congressional scheme. Section 221(d)(3), however, gives no direct financial aid to the tenants. Financial inducements are given, not to the tenants, but to private industry to encourage the private sector to build new rental units that would be accessible to lower and middle income families. Congress could have imposed a strict low rent control system expressly for the benefit of the tenants as a price for the government's financial inducements to prospective builders. But it did not do so because it was not oblivious to the reality that the greater was governmental control of rents and the more procedural detail that enswathed these projects, the less likely it would be that the private sector could be induced to participate.[6] Congress balanced the interests of the tenants in existing 221(d)(3) projects in retaining low rents and the interests of other low and moderate income housing consumers in giving the private sector a sufficiently painless opportunity to earn enough return on its investments to induce it to build, by granting to the individual tenants no enforceable interest in their benefits and by delegating to the FHA the task of regulating rents within flexible standards. (Cf. Langevin v. Chenango Court, Inc., supra, 447 F.2d at 301; Hahn v. Gottlieb, supra, 430 F.2d at 1250.)
 
 
 46
 The same notion can be expressed in a different way. While section 221(d)(3) was clearly intended to benefit specifically those persons who rent units in section 221(d)(3) housing projects, the statutory scheme is more directed to benefiting the class of low and middle income housing consumers than it is to benefiting any specific tenants. The purpose of section 221(d)(3) can be met only if a balance is struck between conflicting goals, the generation of housing, and the maintenance of low rents in the housing generated. Crucial to the balance is the acceptance of somewhat less than optimal achievement of each goal. Thus, although more housing would be generated if rents in section 221(d)(3) projects were not controlled, rents must be subjected to some kind of restraints. Conversely, the fact that tenants of a certain project have their rents raised, even if the rent increase is not necessary for the economic viability of the project, does not mean that achievement of the purpose of the statute is impaired. Section 221(d)(3) is a program intended to maximize the benefit generated for the whole class, even if to do so requires that many individuals in the class be given a less than optimal benefit or no benefit at all. Congress apparently concluded that it is more important that more reasonably inexpensive housing projects be built than that Nilda Keller tenants, for example, have a legal right to rents as low as economically feasible.
 
 
 47
 If these tenants are allowed to prevail, the ability of the program to benefit the entire class of low and moderate income housing consumers would be impaired. To hold that Congress necessarily conferred a legitimate claim of entitlement on these tenants is to hold that Congress is without power to benefit to the degree it desired the entire class of potential tenants. This court should not hold that Congress' power to control its benevolence is so limited. Congress may not confer a legal interest on the condition that if it is accepted, the beneficiaries' interests will be protected by procedures not satisfying due process (see Arnett v. Kennedy, supra, 416 U.S. 134, 166-167, 185, 211, 94 S.Ct. 1633) because of the costs consequent upon a grant of prior notice and hearing; however, it may decide not to confer the legal interest at all (cf. Richardson v. Belcher (1971) 404 U.S. 78, 81, 92 S.Ct. 254; Bell v. Burson (1971) 402 U.S. 535, 539, 91 S.Ct. 1586). Where, as here, the costs of procedural due process protections are substantial, we should not infer that Congress granted an entitlement.[7]
 
 
 48
 Because the tenants have not been able to make the essential showing that they have any enforceable interest in continuing to receive the benefits that they derived from the statutory scheme, they cannot successfully assert that they have entitlements.
 
 III.
 
 49
 Although neither the statute nor the Constitution requires that the tenants be given notice and an opportunity to be heard, I believe that the kind of participation that my brothers describe should be accorded by administrative policy implemented by appropriate regulations.
 
 
 50
 Even if I agreed with my brothers that the tenants had an entitlement, I could not join the majority opinion because, in the guise of granting due process, it eviscerates the due process protections that it purports to grant. The great procedural protections of due process are reduced by the majority to little more than a right to send and receive mail. Procedural due process is flexible, but it is not flaccid. At the barest of minimums, due process requires not only adequate prior notice but also a meaningful evidentiary hearing with a right to personal appearance and a right to call and to examine witnesses as well as to present documentary evidence. While stating that the tenants' interest is substantial, the majority opinion gives the tenants fewer procedural protections than the Supreme Court has held to be constitutionally due prisoners, under the extremely difficult conditions attending prison disciplinary proceedings. (Wolff v. McDonnell (1974) 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935.)
 
 
 51
 I would reverse.
 
 
 52
 /1/ Thus, that an interest is legally protected is both a prerequisite to (cf., e.g., West River Bridge Co. v. Dix (1848) 47 U.S. (6 How.) 507, 532, 12 L.Ed. 535; Reich, The New Property, 73 Yale L.J. 733, 739) and a consequence of (see, e.g., Board of Regents v. Roth (1972) 408 U.S. 564, 92 S.Ct. 2701) its being termed property. Because the relevant legal protections may be of various sorts, an interest may be protected in one manner but not in another. Therefore, a given interest, seemingly paradoxically, may be both property and not property. (Compare Richardson v. Belcher (1971) 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231, with Goldberg v. Kelly (1970) 397 U.S. 254, 262 n. 8, 90 S.Ct. 1011.)
 
 
 53
 /2/ The interest in a benefit that gives rise to an entitlement cannot be an absolute right. If the beneficiary's right to receive the benefit were absolute, the Government without awarding him just compensation could not constitutionally deprive him of the right even after prior notice and hearing.
 
 
 54
 /3/ The notion is akin to standing doctrines. (See generally, e.g., Association of Data Processing Service Organizations, Inc. v. Camp (1970) 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184.) Prerequisites to a claimant's asserting a legal obligation for the purpose of compelling prior notice and hearing are perforce more stringent than those in which he seeks to assert a legal requirement to support review of governmental action in a proceeding after the government has acted.
 
 
 55
 /4/ Thus, if in Arnett v. Kennedy (1974) 416 U.S. 134, 94 S.Ct. 1633, Kennedy had been able to rebut any governmental proof of wrongdoing on his part, the Government would have been statutorily required to have continued his employment; if in Perry v. Sindermann (1972) 408 U.S. 593, 92 S.Ct. 2694, Sindermann had been able to rebut charges of misbehavior, the state might have been required by implied contract of 'common' law to have continued his employment; if in Morrissey v. Brewer (1972) 408 U.S. 471, 92 S.Ct. 2593, Morrissey had rebutted charges that he violated a condition of his parole, the state would have been disempowered from revoking his parole; if in Goldberg v. Kelly (1970) 397 U.S. 254, 90 S.Ct. 1011, Kelly had established his eligibility for welfare, the state would have been statutorily required to continue to pay him welfare benefits.
 
 
 56
 /5/ No factual dispute is material, of course, unless the benefit is conditioned on the existence of the disputed fact.
 
 
 57
 /6/ '. . . Congress has made clear not only in the statutory language, 221(a), which we have quoted, but in a relevant committee report, that the purpose of the 221(d)(3) program was to promote 'the construction of housing by private enterprise' S.Rep. No. 281, 87th Cong., 1st Sess., p. 3 (1961). By leaving rent control in such projects to 'a regulatory agreement' between the Secretary and the mortgagor if no Federal, State, or local law required more, see fn. 7, Congress indicated its belief that a mandatory provision for subjecting all rent increases in such projects to what would amount to a full-fledged public utility rate proceeding, with the expense and delay necessarily incident thereto, might well kill the goose in 'solicitude for the eggs.' Hahn v. Gottlieb, supra, 430 F.2d at 1246. Congress might reasonably think that, in an inflationary era, construction on the basis of distributions limited to 6% Of equity investment, with all the other restrictions imposed on landlords of such projects, would be decidedly unattractive, even with a 3% Interest rate on the mortgage, if rent increases 'necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes * * * and operating and maintenance expenses over which Owners have no effective control,' the only basis recognized in the standard regulatory agreement, can be held up for months during a trialtype hearing, with discovery of the owner's records, the taking of testimony, and written findings by an examiner. . . .' Langevin v. Chenango Court, Inc. (2d Cir. 1971) 447 F.2d 296, 301.
 
 
 58
 (Cf. Hahn v. Gottlieb (1st Cir. 1970) 430 F.2d 1243, 1250.) Even the streamlined procedure mandated by the distrct courts in Geneva Towers and Keller carries with it a substantial risk of disruptive effect. The finances of section 221(d)(3) projects are finely balanced; the desire to keep rents low leaves landlords no uncommitted income to absorb extraordinary costs. Nor are landlords allowed to obtain increases for most predicted rises in costs; rather, rent increases are generally allowed only for cost increased that have already occurred. Hence, if adjustments for increased costs are even slightly delayed, the viability of the projects would be impaired. Furthermore, the costs of successfully applying for governmental approval of a rent increase would also rise. More dangerous than the realization of these risks with regard to existing projects, however, is the deterrent effect that the mere possibility of such effects would have on potential new participants in the program.
 
 
 59
 /7/ The Government in Arnett v. Kennedy argued that the statute there in question did not give a government employee a right to continued employment absent sufficient cause for dismissal; 'it confers instead a narrower right to employment unless sufficient cause for dismissal is established in accordance with the procedures prescribed therein.' (Brief for Appellants at 17, Arnett v. Kennedy, supra.) In essence, therefore, the Government in Kennedy argued that the statute conferred not an entitlement conditioned on a fact, but rather an entitlement conditioned on a finding. Under this view, any expectation of continued employment would have been illegitimate after the requisite finding of unfitness had been made, even if the employee were in fact not unfit for employment. The plurality opinion in Kennedy seems to accept this argument. A majority of the Justices in Kennedy, however, reject the notion that constitutionally sufficient procedures are required when a governmental benefit is conditioned on a fact, but not when it is conditioned on a finding under statutorily prescribed procedures; due process requires, in essence, that when a finding of controverted fact is to be made, it shall be made pursuant to constitutionally sufficient procedures.
 
 
 
 *
 The Honorable Fred M. Taylor, United States District Judge for the District of Idaho, sitting by designation
 
 
 [1]
 Keller v. Kate Maremont Found., 365 F.Supp. 798 (N.D.Cal.1972); Geneva Towers Tenants Org. v. Federated Mortgage Investors, No. C-70 104 SAW (N.D.Cal., Jan. 2, 1973), summarized at 2 CCH Pov.L.Rep. P16,402
 The district court in Geneva Towers also specified that notice to the tenants must be adequately in advance of the effective date of the proposed increase and include the lessor's reasons; that relevant information was to be provided in the application to permit effective challenge; and that the tenants might request information supplied by the FHA to the lessor regarding rents, rent increases and comparable cost structures.
 
 
 [2]
 The district court stayed its order in Geneva Towers pending appeal. Pursuant to stipulation, the rent increase has been paid by the tenants; but the monies have been deposited with the district court
 There have been a number of developments in Keller during the pendency of this appeal. The court granted the government's motion for a stay pending appeal with the proviso that the rents be paid but deposited by the landlord into a special account. Kate Maremont Foundation claimed it was unable to meet the proviso and requested that the FHA reprocess the rent increase application in accordance with the order of the district court. The FHA notified the tenants of the application, received written submissions and, after extensive investigation, granted an additional 4.74% Rent increase over the original 10% Granted in 1971. The FHA subsequently provided a concise statement of the reasons for approving the increase on April 20, 1973. The ramifications of these developments have been discussed in the context of mootness by the parties in supplemental briefs.
 Mootness is not the problem here, for the controversy over what due process rights, if any, should be afforded the tenants of 221(d)(3) projects, remains a live one to the foundation. Cf. Powell v. McCormack, 395 U.S. 486, 495-500, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The issue is whether Kate Maremont Foundation's compliance with the district court's order forecloses its appeal. We think it does. The general rule in the federal courts is that compliance with a judgment, of itself, does not cut off the right of appeal. Ferrell v. Trailmobile, Inc., 223 F.2d 697, 698 (5th Cir. 1955). There are exceptions to the rule: (1) when compliance is by way of compromise or shows an intention to abide by the judgment; (2) when compliance is coupled with acceptance of a benefit; or (3) when compliance renders appellate relief futile. Id. at 698. Not only did Kate Maremont Foundation indicate an intention to abide by the order of the district court, there is no relief this court can now grant the Foundation other than of a declaratory nature. We point out that our foreclosing of Kate Maremont's appeal in no way jeopardizes that of the tenants or the government in Nos. 72-2756, 72-2784, or 72-2788.
 
 
 [3]
 H.Rep. No. 447, 87th Cong., 1st Sess. 11 (1961)
 
 
 [4]
 12 U.S.C. 1715l(a)
 
 
 [5]
 See Note, Procedural Due Process in Government-Subsidized Housing, 86 Harv.L.Rev. 880, 884 n. 19 (1973)
 
 
 [6]
 12 U.S.C. 1715l(a); H.Rep. No. 447, supra note 3, at 11; S.Rep. No. 281, 87th Cong., 1st Sess. 8 (1961), U.S.Code Cong. & Admin.News. p. 1923
 
 
 [7]
 This is in accordance with federal regulation, 24 C.F.R. 221.531(c) (1973), which provides:
 Rents and Charges. In approving the allowable rents and charges and in passing upon applications for changes, consideration will be given to the following and similar factors: (1) Rental income necessary to maintain the economic soundness of the project. (2) Rental income necessary to provide a reasonable return on the investment consistent with providing reasonable rentals to tenants.
 The procedure for FHA approval of a rent increase is found in U.S. Dep't. of Housing and Urban development, Insured Project Servicing Handbook, A HUD Handbook, No. RHM 4350.1, supp. 1 (1970).
 
 
 [8]
 Regulations also specify that a limited distribution mortgagor, such as Geneva Apartments, Inc., cannot receive more than a six percent return on its initial equity investment. 24 C.F.R. 221.532(a) (1973)
 
 
 [9]
 42 U.S.C. 291-291o (1970). The Hill-burton Act provides federal subsidization for the construction of private nonprofit hospital facilities pursuant to a federally-approved state plan. A number of courts have found the requisite federal action in the program. See, e.g., Simkins v. Moses H. Cone Memorial Hosp., 323 F.2d 959 (4th Cir. 1963)
 
 
 [10]
 The Court held in Goldberg that welfare benefits were a matter of statutory entitlement for persons qualified to receive them, id. at 262, 90 S.Ct. 1011, and required a hearing before benefits could be terminated. Id. at 266-271, 90 S.Ct. 1011
 
 
 [11]
 See Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Board of Regents v. Roth, 408 U.S. 564, 569-572, 92 S.Ct. 2701 (1972); Perry v. Sindermann, 408 U.S. 593, 599-600, 92 S.Ct. 2694 (1972); Fuentes v. Shevin, 407 U.S. 67, 84, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)
 
 
 [12]
 See, e.g., Morrissey v. Brewer, supra at 483-490, 92 S.Ct. 2593
 
 
 [13]
 Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), does not affect this frame of analysis but, in fact, reaffirms it. There, the Court held that a federal civil service employee had no right to a full hearing prior to dismissal from his job. The case centered on a provision of the Lloyd-LaFollette Act, 5 U.S.C. 7501, which provides that 'an individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service.' In subsection (b) of this provision the employee is given the right to respond in writing to the charges but is specifically denied the right to a full scale hearing which would include the right to confront witnesses and the like. Justice Rehnquist's plurality opinion, joined by the Chief Justice and Justice Stewart, reasons that the employee did not have a statutory entitlement to continued employment based on a right to a pre-discharge hearing because the right to employment was statutorily conditioned on a denial of a full hearing. Id. at 136, 94 S.Ct. 1633. However, the other six justices rejected this reasoning. See id. at 164, 171, and 206, 94 S.Ct. 1633 (Justice Powell, concurring; Justice White, concurring in part and dissenting in part; and Justice Brennan, dissenting). They basically agreed that once a substantive right has been created, it is the Due Process Clause which provides the procedural minimums, and not a statute or regulation. Justice Powell, joined by Justice Blackmun, agreed with the plurality only as to the result based on a Goldberg-type balancing; he reasoned that the statutory procedures were sufficient to satisfy Due Process, particularly since the employee had a right to a full post-discharge hearing. See id. at 164, 94 S.Ct. 1633
 
 
 [14]
 It is perhaps possible to argue that the primary beneficiaries of 221(d) (3) are the class of low income housing consumers, and not merely the tenants of the projects, since a purpose of the program is arguably to depress the cost of housing available to the entire class by adding to the stock. Therefore, it could be said that since no individual benefit is intended, the tenants have no claim of entitlement. Although it is perhaps true that low income housing consumers are a class of beneficiaries, the legislative history leaves little doubt that the individual tenants were intended to be the principal beneficiaries. See ante and compare Tenants Council of Tiber Island-Carrollsburg Square v. Lynn, 497 F.2d 648 (D.C.Cir.1973)
 
 
 [15]
 See, e.g., Morrissey v. Brewer, 408 U.S. at 481-490, 92 S.Ct. 2593; Bell v. Burson, 402 U.S. 535, 539-542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Richardson v. Perales, 402 U.S. 389, 401-406, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Goldberg v. Kelly, 397 U.S. at 263-271, 90 S.Ct. 1011; Note, supra, 86 Harv.L.Rev. at 891
 
 
 [16]
 This Guide, at 209, sets forth the general factors that the FHA will consider:
 HUD will entertain a written request for a rent increase to compensate for any net increases in taxes and operating expenses over which owners have no effective control. The mortgagor should carefully consider the local rental market to determine if a rent increase will allow the project to remain competitive . . .. A mortgagor must also be certain that all unnecessary expenses are reduced to a minimum . . .. Evidence of increased expenses must also be submitted.
 
 
 [17]
 See Mitchell v. W. T. Grant Co., supra at 624-627, 94 S.Ct. at 1908-1909 (Powell, J., concurring)
 
 
 [18]
 In Mitchell, in which the Court upheld a Louisiana statute permitting a seller to gain sequestration of installment-purchased goods without prior notice and hearing, the balance worked out quite differently. If pre-seizure notice and hearing were to be required, the rights of the seller-- who was viewed, importantly, as a joint owner of the goods, id. at 604, 94 S.Ct. at 1898-- would be jeopardized since the goods would continue to depreciate and the debtor might sell the goods cutting off the seller's security interest altogether. Id. at 604-605, 94 S.Ct. at 1899. On the other hand, the debtor was relatively well protected. The seller was required to put up a bond adequate to cover the value of the goods and attorney's fees should the sequestration prove groundless; process was issued by a judge and not a court clerk, thus 'Minimiz(ing) the risk of error,' id. at 609, 94 S.Ct. at 1901; the debtor could regain the property by putting up a bond; and the debtor could have an immediate post-sequestration hearing on the matter of possession
 
 
 [19]
 Certain other courts are in agreement. See Marshall v. Lynn, supra; Thompson v. Washington, supra; Burr v. New Rochelle Municipal Housing Authority, supra; Paulsen v. Coachlight Apartments Co., supra. But see Hahn v. Gottlieb, supra; People's Rights Org. v. Bethlehem Associates, 356 F.Supp. 407 (E.D.Pa.1973)